**Opinion issued May 9, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00007-CV

_____

## IN RE H.D., A CHILD

---

**On Appeal from the 310th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-52475**

---

## MEMORANDUM OPINION

Appellants, M.D. and R.D., appeal the trial court's termination of their parental rights to their child, H.D.  M.D., the mother, argues that the evidence was legally and factually insufficient to support: termination of her parental rights pursuant to Family Code section 161.001(1)(E), (F), and (O); the trial court's finding that termination of her parental rights was in H.D.'s best interest; and the

appointment of the Department of Family and Protective Services ("DFPS") as H.D.'s conservator. R.D., the father, argues that the evidence was legally and factually insufficient to support: termination of his parental rights pursuant to Family Code section 161.001(1)(D), (F), and (O); the trial court's finding that termination of his parental rights was in H.D.'s best interest; and the appointment of DFPS as H.D.'s conservator.

We affirm.

## Background

M.D. is the mother of four children: an adult daughter; a teenage son, J.H.; a teenage daughter, C.Y.; and her daughter with R.D., H.D. H.D. was born in 2007 and is the child who is the subject of this appeal. [1]

On August 21, 2010, DFPS received a referral of physical abuse concerning J.H. and H.D. According to documents filed by DFPS, the report of abuse stated that M.D., J.H., and H.D. were kicked out of a trailer home two months prior to the referral because of M.D.'s drug use and inability to pay rent, and the three of them went to live with an unrelated man. The home where M.D. lived with J.H. and H.D. was, according to the report, shared with seven unrelated adults and was

---

[1]  The trial court also terminated M.D.'s rights to her two other minor children, J.H. and C.Y. M.D. does not challenge the termination of her rights to J.H. and C.Y. The trial court also terminated the parental rights of C.Y.'s father, but he is not a party to this appeal.

"known as a drug haven." The report alleged that "the adults that live in the home steal a lot of vehicles and copper" and that they "use methamphetamine, cocaine, and marijuana."

DFPS and law enforcement subsequently investigated the home and discovered, according to the DFPS file, that "methamphetamine was being manufactured in the home in areas that are accessible to the two kids." The DFPS report also contained the following statements: M.D. is addicted to methamphetamine; M.D. gave J.H. methamphetamine and smoked it with him in front of H.D.; M.D. has given J.H. marijuana to smoke since he was seven years old, and M.D. allowed him to smoke marijuana because of his diagnosis of bipolar disorder; J.H., H.D., M.D. and two of the unrelated adult males living in the house all slept in the same bed; H.D. made an outcry that one of those men touched her between her legs; M.D. was aware of H.D.'s outcry but was fearful to contact law enforcement because of her drug addiction and because she had warrants for her arrest; and H.D. had bruises on her legs, but their origin was unknown.

On August 23, 2010, DFPS filed its original petition for protection of H.D. and termination of M.D.'s and R.D.'s parental rights. A permanency plan and progress report filed with the trial court on February 22, 2011 stated that DFPS removed J.H. and H.D. from M.D.'s care on August 23, 2010. DFPS found C.Y. in the care of her maternal uncle and discovered that there was an open

3

investigation concerning the uncle's alleged sexual abuse of C.Y. That investigation had been opened on May 27, 2010. The progress report further stated that M.D. "and other members of the household as well as C.Y. made outcries of drug use in the home while the children were present." The progress report stated that M.D. had not completed any services provided for in her family service plan at that time, the caseworker had had minimal contact with M.D., and their first face-to-face meeting had not occurred until January 6, 2011.

This report also contained the information gathered during DFPS's investigation. Upon arrival at the reported residence on August 21, 2010, the DFPS investigator was met by two Harris County Sheriff's Department deputies who were familiar with the residence due to "drug allegations." The woman who admitted the DFPS investigator to the property stated she was the girlfriend of the homeowner and that the homeowner and another adult resident had been arrested on August 20, 2010 on "unknown charges" and had not been heard from since. The investigator "immediately noticed numerous pipes, spoons and baggies distributed throughout [the homeowner's] bedroom used for drug use purposes," and she noted that the paraphernalia "was seen to have residue present." The investigator "also observed over thirty pornographic items (pictures, magazines, videos, and paintings) throughout the room and home which were all accessible to the children residing in the residence." She further stated, "The room was much

cluttered and there was a video camera setup facing the bed but the use was not confirmed by the residents in the home." The DFPS investigator noted that "[t]he home was cluttered with tools, clothes, and other items but the living room and kitchen appeared clean and appropriate with no concerns except for a picture hanging in the front room of a woman's vagina with her arm fingering the vagina in plain view."

The investigator interviewed the man against whom H.D. made an outcry of sexual abuse. He denied the allegations, but he confirmed that he, M.D., J.H., and H.D. "sleep in the same bed with another adult male." She further stated that three of the adult men in the home and M.D. "all admitted openly to drug use going on in or around the home": specifically, one man "stated that there was 'a lot of use, abuse and contribution, but no meth lab' located on the property"; another "admitted to past methamphetamine use but denies ever using in front of the children [and] was arrested recently for possession of marijuana and spent 7 months in prison for 4 g of methamphetamine five years ago"; and M.D. "stated that she would test positive for marijuana but denied using methamphetamines anymore." M.D. admitted that she had a "history of use and abuse of methamphetamines."

The DFPS investigator interviewed J.H., who at first "denied any and all drug use but later recanted, stating that he actively uses alcohol, beer, liquor,

5

marijuana, pills (Xanax, Soma, and Ecstasy) and methamphetamines." J.H. had been diagnosed as bipolar, but he had not taken his medications "in two to eight months." The investigator noted that H.D. "was observed to be dirty and very unkempt. She also had [a] grave lice infection that was found to have left scabs in her head due to non-treatment." This same DFPS investigator also interviewed C.Y., who "made an outcry of sexual abuse against her biological father, . . . as well as methamphetamine use by her mother [M.D.], sister [M.D.'s adult daughter], and brother [J.H.] while in their care" at the home where M.D. was residing at that time. C.Y. reported that she had seen M.D. obtain methamphetamines from the homeowner's room and smoke the drug in a separate building on the property, and she stated that she "regularly" saw her mother and other residents of the home smoking methamphetamine. C.Y. stated that "she has received nose bleeds in the past due to this exposure and feels safest with [the maternal uncle who was being investigated for sexually abusing her]."

At the trial on December 7, 2011, DFPS caseworker Bryan Victorian testified that, according to DFPS's records, H.D. and the other children had been living with M.D. in a house with seven other unrelated adults, and DFPS investigators "found things that showed that they were manufacturing methamphetamine as well as the property had a place where they were bringing cars and breaking the cars down. A chop shop is what you call it." Specifically,

Victorian recounted the results of the investigation, including the discovery of drug paraphernalia, such as baggies, pipes, and spoons, and of pornography, including "many" magazines, in the same room where the children slept. He also stated that DFPS found a pornographic picture of a vagina "on the refrigerator." There was also "a video camera facing the bed where the children slept."

Victorian testified that, at the time they were removed, the children were very dirty, had "poor hygiene," and had a "severe" lice infestation. C.Y. complained of nose-bleeds that she stated were a result of exposure to drugs.

Victorian also testified that DFPS's records stated that J.H. told DFPS caseworkers in the course of the investigation that he used drugs, including methamphetamines and marijuana, and that he "was allowed to use cocaine" for his sixteenth birthday. Victorian stated that J.H. went into a treatment facility after he was removed from M.D.'s care and was currently residing with his biological father.

Victorian testified that H.D. made an outcry of sexual abuse by one of the people that resided in the home where she was staying with her mother and that H.D. reported that the man who abused her was "allowed to sleep in the bed" with her. He testified that H.D. underwent an evaluation for the alleged abuse and that she never recanted and did not "ever change [her] story." He stated that DFPS's procedure is to notify law enforcement once an allegation is made, and the

subsequent decisions regarding a criminal investigation are made by law enforcement, not DFPS. Victorian did not know whether any formal criminal charges were ever made. Victorian also indicated that C.Y. made an allegation of abuse against her biological father, in addition to the outcry against her uncle.

Victorian testified that DFPS's investigation of the case revealed that law enforcement officials were investigating the residence where the children had been living for drug activity.

Regarding R.D., Victorian testified that he had "significant contact" with M.D. during the time immediately prior to the children's removal and that he knew or should have known what was going on in the lives of the children. Victorian stated that R.D. had been placed on probation for domestic violence toward M.D. and that he subsequently had his probation revoked, and, thus, R.D. was in jail at the time H.D. was removed from M.D.'s care.

Victorian further testified that neither M.D. nor R.D. had completed their service plans. He stated that neither R.D. nor the father of C.Y. had paid any child support.

Victorian also testified that M.D. admitted at the time the children were removed that she would fail a drug test. Subsequently, she missed three random drug tests, and Victorian stated that a missed drug test "counts as a positive." He stated that M.D. had not refrained from drug use and had not shown any indication

8

that she was trying to overcome her drug problems. Victorian also testified that M.D. did not cooperate with DFPS in order to be reunified with her children. Specifically, he testified that M.D. did not complete a drug assessment, did not submit to random urinalysis, and had not maintained appropriate housing or employment. He testified that, on one occasion when she missed her urinalysis, she claimed to be in the hospital. However, neither the hospital nor the medical records supplied by M.D. substantiated her claim. On another occasion, she stated that she was out of town. Victorian testified that M.D. was not cooperative because "that was the case every time I called her."

Victorian testified that R.D. also missed random drug tests and failed to cooperate with DFPS, in spite of the fact that he was released from prison "four or five months" before trial.

At the time of trial, H.D. and C.Y. were in foster care placements, and J.H. was living with his father. Victorian testified that H.D. and C.Y. were in separate foster homes because "there [were] many instances where the older child attempted to be the mother figure, so she would be what I would say rough and also, you know, she would always scream at her sister." This caused "emotional issues" with H.D., including nightmares, and H.D. reported to her therapist that C.Y. "was hurting her" and made other outcries of "pretty severe physical abuse" by her sister. Victorian stated that when the two girls were placed together in the same

9

home, C.Y. "had some cutting issues," and the foster parents "found some things that they felt [were] a concern," including that C.Y. "wrote . . . she sometimes felt like she wanted to die and also they found some broken glass." Victorian testified that DFPS felt it would be best to place the children in separate foster homes.

Victorian testified that DFPS's long-term goal for C.Y. and H.D. was unrelated adoption. H.D.'s current foster family had "talked about" adopting her, but "[t]hey haven't made it official." However, he testified that the family had begun the process of applying to adopt H.D. He testified that C.Y. was in a therapeutic foster placement and that DFPS currently did not have a permanent placement for C.Y. DFPS's primary focus was on "making sure she's healthy." He testified that it was in H.D.'s best interest to remain in her current placement and that the placement was meeting all of her physical and emotional needs. He stated that H.D.'s foster parents loved her and she loved them. He testified that H.D.'s foster parents had adequate resources to care for her and provide everything she needs. Victorian testified that termination of M.D.'s and R.D.'s parental rights was in H.D.'s best interest.

On cross-examination, Victorian testified that, although the pornographic materials were readily accessible by the investigator who made the report and were found in the same room where the children slept, he did not have any knowledge regarding whether those materials were also accessible to the children. He further

10

stated that methamphetamine was being manufactured in the residence, based on "the reports from the police department." He also acknowledged that the baggies and spoons discovered in the bedroom during the investigation were "normal kitchen items" that were not "labeled for methamphetamine manufacture." However, he testified that subsequent testing established that those items contained drug residue. He also acknowledged that he did not have any personal knowledge regarding the manufacture of methamphetamine or the existence of a "chop shop" on the property. He based his testimony on the investigation report contained in DFPS's case file.

Bruce Jeffries testified regarding M.D.'s drug tests. He testified that the first drug test was dated August 23, 2010, and that the test was positive for methamphetamine and marijuana metabolite. M.D. was against tested on August 31, 2010, and her urine tested positive for marijuana metabolite, and her hair tested positive for methamphetamine and marijuana. M.D.'s February 22, 2011 test was positive for marijuana. Finally, on August 23, 2011, her hair sample tested positive for methamphetamines. Jeffries testified that there were no prescription medications that could cause a positive methamphetamine result.

Jeffries further testified that he tested R.D. on August 23, 2011 as well, and R.D.'s hair tested positive for methamphetamine.

11

M.D. testified that at the time her children were removed they were living in a house with seven other adults and that she and her children all shared one bedroom. She stated that she did not believe her children were dirty or had poor hygiene. She acknowledged there was a problem with head lice that she was trying to take care of.

M.D. testified that she did not ever see any methamphetamine being manufactured on the premises, and she was not aware of any illegal activity relating to a chop shop. Regarding the video camera observed by the DFPS investigator, M.D. testified that it was "an antique video camera" that did not work, and it was set on the headboard of the bed. Regarding pornographic material in the house, M.D. testified that there was a painting, done by the owner of the home when he was in seventh grade, of a female's torso. M.D. considered it a work of art and did not feel it was inappropriate in any way. She testified that the remainder of the pornographic materials found in the house were not accessible to her children.

Regarding drug use and drug paraphernalia, M.D. testified that there was narcotic paraphernalia "in a room that had locked doors where [her] children were not allowed to go" but she "did not know that there was any methamphetamine being used." M.D. acknowledged that she had admitted to smoking marijuana when her children were first removed, and she testified that she knew she "had

12

done meth before" but "did not think [she] would going to test [positive] for it." She stated that since the children were born, she would use drugs "sometimes on the weekend whenever they were gone, but not regularly," and she "would do it outside." She further testified that she "tried not to be around my children even high, but I—I really tried." M.D. also admitted that she was aware that "there was drug usage going on in that house" where she was staying with her children at the time of removal, but she stated that the drug use "was not in front of [her] children." M.D. testified that she knew that it was not a proper environment for her children, but she stayed because she "had nowhere else to go at the time." When the children's attorney questioned her regarding the children's outcry statements that they had observed M.D. using drugs, M.D. responded, "We did drink, so that would be the only thing. Smoking and drinking and C.Y. hates smoking and drinking, period."

M.D. acknowledged that DFPS presented her with a service plan after her children were removed, and she testified that she completed "everything except for [her] counseling with Ed Pendleton." M.D. testified that she was unable to complete her counseling when she relocated from Livingston to Splendora. She further testified that she abstained from drug use and that she tested positive for methamphetamine in August 2011 because of medication she was given for bronchitis in the course of a two-and-a-half-week hospitalization. Regarding the

13

three missed random urinalysis screenings, she testified that she could only recall missing two: one because she was in the hospital, and one because she was in San Antonio caring for her adult daughter who had been in a car wreck. She testified that she offered to take the test somewhere in San Antonio, but the caseworker never gave her a location where she could have the test completed.

M.D. acknowledged that she did not pay any child support after her children were removed by DFPS. She stated that she worked part-time at the time of trial doing errands for an elderly lady and earned approximately $50 to $75 a week. She was currently living in a house with her husband, R.D.

M.D. testified that she had been the primary caregiver for each of her children, she loved them, and she missed them very much. She testified that she never gave J.H. permission to use cocaine and "didn't even know he was doing that until all this came about." She testified that J.H. was "always in trouble," that she had "been to court a lot of times" with him because he was "uncontrollable," that he "kept running away," and that "he was really abusive to [her] sometimes." M.D. stated that she had been in the process of trying to get J.H. to live in California with his father in hopes that a different environment would help him. M.D. testified that, since her children were taken away, she learned that she had "made a lot of wrong decisions and that I could have—I should have made better ones." She testified that if her children were returned to her, she "would keep/stay

14

in church and would do a lot more things as a family together instead of just letting them go off with their friends or a cousin. Be more of a unit, you know, spend more time." She further testified that she had a three-bedroom home with a room ready for H.D. and C.Y. and that she had "everything I need for my girls." When asked how she maintained the house financially, she testified, "My husband [R.D.] works every day. And I've always been able to provide for my children. I've always had—we've always had our own stable home."

M.D. later admitted that at the time the children were removed from her care, C.Y. was actually living with her uncle. When questioned about the allegations of sexual abuse by H.D. and C.Y., M.D. stated that she was not aware of anything having happened and that H.D. "never even acted like anything. Like children are always happy, always—never said anything to me about that." M.D. further testified that she was unaware of the DFPS investigation into sexual abuse of C.Y. that began approximately three months before the children were removed from her care because "nobody told [her]."

She stated that, if the children were returned to her, R.D. would continue working, and she would be a homemaker. She testified that she had never seen R.D. use drugs and did not think he was a drug abuser, but she had seen him drink. She also testified that R.D. had a relationship with H.D. and had cared for her in the past and that he loved H.D. and had bonded with her.

15

R.D. testified that he "was in jail for domestic violence and got out on four years deferred" and then subsequently "went back to prison . . . for probation violation." He stated that he did not have a job at the time his probation was revoked and was living in the country with no way to get to work, so he could not pay any fines. R.D. testified that he attended only one of the required counseling sessions. He also testified that he had used drugs, including marijuana, methamphetamines, cocaine, and others, and that his "major addiction was alcohol." He also testified that he had observed M.D. use drugs "in the past" and that they "used to smoke weed together." R.D. denied using methamphetamine or seeing M.D. use methamphetamine, despite their positive drug tests approximately three months before trial.

R.D. testified that his criminal record included convictions for marijuana possession, family violence, burglary of a habitation, and driving with a suspended license. R.D. also acknowledged that the family violence conviction was for violence directed at M.D., and he testified that the children were living with him and M.D. at the time of the abuse, although the abuse occurred outside while the children were in the house.

R.D. testified that before he went to prison he lived with the children, took care of them, washed their clothes, made their meals, and "did everything for those kids." R.D. stated that he cared for H.D. from the time she was born until he went

16

to prison when she was almost three years old. He further testified that when he left for prison M.D. was living with her mother and he did not know what happened that caused her to come to live in the house where she was living when the children were removed. When asked whether his imprisonment had anything to do with M.D.'s circumstances, R.D. stated, "I'm sure it did." R.D. further stated that none of the actions causing the children to come into DFPS's care were directly attributable to him, although he was "sure [his] going to prison had some bearing on it."

R.D. admitted that he had not paid any child support for H.D. since he was released from prison on March 31, 2011. He testified that he worked in construction and made approximately $1,600 or $1,700 a month. He testified that, since his release, he had attempted to complete as many court-ordered services as he could. He had "done some parenting classes. I went to the psychological evaluation. I've got a job, I've got a residence. I pay the light bill, the water bill. I've got a house full of furniture. I support my wife." He testified that he worked between ten and twelve hours a day, six or seven days a week, so it was "very difficult" to work his services. R.D. acknowledged that, although he had started his parenting classes, he had not obtained a certificate of completion. He also attempted to do his drug assessment when he "went one time and we were

17

rescheduled. And she told me—well, I thought she told me the 27th. She told me the 22nd."

R.D. stated that if H.D. were returned to him he would take care of her, provide for her, and protect her. He believed it was in H.D.'s best interest to be returned to him. R.D. further testified that he had observed M.D. with the children and thought she was appropriate with them. He stated that M.D. loved the children and they loved her. He testified that removing C.Y. and H.D. from himself and M.D. would cause emotional problems. He stated that "it's already messing with C.Y. I mean, she didn't do this before, the cutting stuff. She didn't do that before she got took away. I mean, she was just a little girl. I've been her dad ever since she was three years old. And it's going to hurt them." He also did not believe it was good for the siblings to be split up. R.D. testified that he and M.D. had cooperated with DFPS to the best of their abilities.

The trial court signed its final decree of termination on December 19, 2011. The court found that termination of the parent-child relationship between M.D. and H.D. was in H.D.'s best interest and was warranted under Family Code subsections 161.001(1)(E), (F), and (O). The trial court further found that termination of the parent-child relationship between R.D. and H.D. was in H.D.'s best interest and was warranted under subsections 161.001(1)(D), (F), and (O). The trial court named DFPS as H.D.'s sole managing conservator.

18

**Standard of Review for Termination of Parental Rights**

In a case to terminate parental rights brought by DFPS under section 161.001, DFPS must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2012); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002); *see also Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985) (holding that because termination of parental rights "is complete, final, irrevocable, and divests for all time that natural right . . . . [,] the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights") (citing *Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

In conducting a legal-sufficiency review in a parental-rights-termination case under Family Code section 161.001, we must look at all the evidence to determine whether the evidence viewed in the light most favorable to the finding is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *In re J.P.B.*,

19

180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d at 266. We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible." *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266; *see also Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (when legal sufficiency of evidence in parental rights termination suit is challenged, reviewing court should look at all evidence in light most favorable to finding to determine whether reasonable trier of fact could have formed firm belief or conviction that its finding was true, disregarding all evidence that reasonable fact finder could have disbelieved or found incredible, but not disregarding undisputed facts that do not support finding, as doing so could skew analysis of whether there is clear and convincing evidence that matter that must be proven is true).

"[T]ermination findings must be upheld against a factual sufficiency challenge if the evidence is such that a reasonable jury could form a firm belief or conviction that grounds exist for termination under Texas Family Code sections 161.001 and 161.206(a)." *In re C.H.*, 89 S.W.3d at 18–19. To reverse a case on insufficiency grounds, "the reviewing court must detail the evidence relevant to the issue of parental termination and clearly state why the evidence is insufficient to

support a termination finding by clear and convincing evidence." *Id*. at 19. In *In re C.H.*, the supreme court emphasized that, in applying the "clear and convincing" evidence standard, the appellate courts "must maintain the respective constitutional roles of juries and appellate courts." *Id.* In that regard,

> An appellate court's review must not be so rigorous that the only fact-findings that could withstand review are those established beyond a reasonable doubt. . . . While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.

*Id*. at 26 (citation omitted).

DFPS must establish both elements—that the parent committed one of the acts or omissions enumerated in section 161.001(1) and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *In re C.H.*, 89 S.W.3d at 23. Termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). However, "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of

21

parental rights. *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.).

**Termination of M.D.'s Rights to H.D.**

In her first issue, M.D. argues that the evidence supporting the trial court's termination of her parental rights to H.D. under subsection 161.001(1)(E) was legally and factually insufficient.

## A.     Termination under Subsection 161.001(1)(E)

Subsection 161.001(1)(E) provides that a parent's rights can be terminated when she has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E).

"Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also Jordan*, 325 S.W.3d at 723 ("The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being."). In this context, endanger means "to expose to loss or injury; to jeopardize." *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (quoting *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Boyd*, 727 S.W.2d at

22

533)).  A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.  *Jordan*, 325 S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

Termination under subsection 161.001(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent.  *Jordan*, 325 S.W.3d at 723; *In re J.T.G.*, 121 S.W.3d at 125.  "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury."  *In re T.N.*, 180 S.W.3d at 383 (citing *In re M.C.*, 917 S.W.2d at 269); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that endangering conduct is not limited to actions directed toward child); *Boyd*, 727 S.W.2d at 533 (holding that endanger means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury"); *Jordan*, 325 S.W.3d at 723 (holding that danger to child need not be established as independent proposition and may be inferred from parental misconduct even if conduct is not directed at child and child suffers no actual injury).  Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after

23

the child's birth. *In re J.O.A.*, 283 S.W.3d at 345 ("[T]he endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage."). The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed [from the home] by the Department." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

As a general rule, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *see also Jordan*, 325 S.W.3d at 724 ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."). Furthermore, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re T.N.*, 180 S.W.3d at 383 ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children."). Illegal drug use may support termination under subsection 161.001(1)(E) because "it exposes

24

the child to the possibility that the parent may be impaired or imprisoned. . . ." *Walker*, 312 S.W.3d at 617.

Here, the evidence demonstrated M.D.'s ongoing use of illegal drugs. At the time H.D. was removed from her care, M.D. acknowledged that she would test positive for marijuana use. M.D. also testified that she had a history of drug use and that she had used drugs throughout her children's lives. The drug tests admitted into evidence demonstrated that, in August 2010, she tested positive for both marijuana and methamphetamine use. The last drug test admitted into evidence, from August 2011, demonstrated that M.D. again tested positive for methamphetamine use.

In addition to the evidence of M.D.'s drug use, DFPS presented evidence of other conduct or omissions of M.D. that endangered H.D. Victorian testified that the DFPS investigation revealed that, at the time H.D. was removed from her mother, they were living in a home with multiple unrelated adults. Items such as drug paraphernalia and pornography were found in the house, and, according to the DFPS investigation, these items were readily accessible to H.D. H.D. made an outcry of sexual abuse by one of the unrelated males who had been living in the home with her. Victorian further testified that, at the time of removal, H.D. was dirty and had poor hygiene, including a severe lice infestation.

M.D. argues that this evidence is insufficient to support termination of her parental rights because there was no evidence that methamphetamines were being manufactured in the home, that a chop-shop was being operated on the property, or that criminal charges were filed regarding H.D.'s outcry of sexual abuse. However, such proof is not required to establish endangerment under subsection 161.001(1)(E), especially in light of M.D.'s admission that she was aware of drug use occurring in the home where she lived with H.D., her admission of her own history of drug use, and the results of her drug tests. *See In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re S.D.*, 980 S.W.2d at 763 (holding that subjecting child to life of uncertainty and instability endangers child's physical and emotional well-being).

M.D. further argues that the drug paraphernalia and pornography were not accessible to H.D. and that H.D. was not exposed to any drug use. We again observe that M.D.'s drug use need not have been conducted in H.D.'s presence for it to have had a negative effect on M.D.'s ability to parent. *See In re J.O.A.*, 283 S.W.3d at 345; *Walker*, 312 S.W.3d at 617 (holding that endangering conduct need not occur in child's presence and may occur both before and after child has been removed). Furthermore, the trial court, as factfinder, was the sole arbiter of the credibility of the witnesses. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006)

26

(per curiam). In light of Victorian's testimony that DFPS investigators found drug paraphernalia that was accessible to the children in the home and the evidence of M.D.'s ongoing drug use, the trial court was not required to believe M.D.'s assertions that H.D. was not exposed to drug use or M.D.'s explanations for her positive drug tests.

We hold that the evidence was legally and factually sufficient to support the trial court's termination of M.D.'s parental rights pursuant to section 161.001(1)(E). Accordingly, we do not need to determine whether the evidence was sufficient to support termination under either section 161.001(1)(F) or 161.001(1)(O). *See In re A.V.*, 113 S.W.3d at 362 (holding that trial court only needs to make one finding of parental misconduct under Family Code section 161.001(1)).

We overrule M.D.'s first, second, and third issues.

## B. H.D.'s Best Interest

In her fourth issue, M.D. argues that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in H.D.'s best interest.

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a

27

safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2008). Among others, the following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of harm to the child; whether there is a history of substance abuse by the child's family or others that have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care, guidance and supervision, and a safe physical home environment; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *In re R.R.*, 209 S.W.3d at 116 (stating that several factors should be taken into account in determining best interest, including stability of proposed placement and willingness of child's family to effect positive changes).

The Texas Supreme Court has set out some additional factors that courts can consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *In re C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *See In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *In re C.H.*, 89 S.W.3d at 28; *In re N.R.T.*, 338

S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). Furthermore, the best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *See In re N.R.T.*, 338 S.W.3d at 677.

Here, multiple factors support the trial court's finding that termination was in H.D.'s best interest. Evidence of H.D.'s emotional and physical needs now and in the future, the emotional and physical danger to her now and in the future, and M.D.'s acts or omissions indicating that the existing parent-child relationship is not a proper one supports termination. *See Holley*, 544 S.W.2d at 371–72 (factors, two, three, and eight). We have already concluded that the evidence was sufficient to show that M.D.'s behavior endangered H.D.—M.D.'s pattern of drug use and the circumstances in which H.D. lived at the time DFPS took custody of her were evidence of danger to H.D. The evidence also supported a conclusion of future danger to H.D., as M.D. continued to deny her drug use—in spite of her positive drug tests and Jeffries' testimony that her positive methamphetamine result could not have been caused by any prescription medication—and, according to Victorian, she was uncooperative with DFPS's efforts to reunite her with her children. *See* TEX. FAM. CODE ANN. § 263.307(b) (providing that courts may consider magnitude, frequency, and circumstances of harm to child, whether there is history

of substance abuse, and parent's willingness to seek out and complete counseling services and cooperate with appropriate agency).

M.D. argues in her appellate brief that there "was no evidence that [H.D.] had any special physical needs." While this is true, it does not undermine the trial court's finding that termination was in H.D.'s best interest. Rather, it is more properly considered a neutral factor. M.D. also argues that the only testimony regarding H.D.'s emotional needs was Victorian's testimony that she "was experiencing nightmares about her sister." M.D. argues that there "is no evidence that the nightmares were due in any way to [M.D.'s] actions or inactions," that the nightmares started while the children were in DFPS custody, and that "[t]he endangerment to the child was created entirely by the situation that the Department placed her in." However, Victorian testified that part of the problematic relationship between C.Y. and H.D. was caused by C.Y.'s attempting "to be the mother figure" and physically hurting H.D., and the evidence in no way supports a conclusion that DFPS endangered H.D. Victorian testified that C.Y. was placed in a therapeutic placement once the issues between the siblings became apparent to DFPS and that H.D. is now doing well in her foster family. Thus, these considerations do not support M.D.'s claim that continuing the parent-child relationship is in H.D.'s best interest.

In addition, the evidence demonstrated M.D.'s lack of parenting ability, further supporting a conclusion that termination was in H.D.'s best interest. At the time H.D. came into DFPS custody, H.D. was dirty and had poor hygiene, and she was living in a home with multiple unrelated adults who were involved in the use of drugs and other alleged illegal activities. *See id.* (providing that courts may consider demonstration of adequate parenting skills, including providing child and other children under family's care with minimally adequate health and nutritional care, guidance and supervision consistent with child's safety, and safe physical home environment that is free from exposure to violence). M.D. testified to the trouble she had caring for J.H. due to his drug problems and behavioral problems. M.D. also allowed C.Y. to continue living with a relative who was under investigation for sexually abusing her, and she testified that she was not aware of the pending investigation because no one had told her about it. This evidence supports a conclusion that M.D. lacked the parenting skills to provide for her children's basic emotional and physical needs. M.D. argues that she attempted to help J.H. with his drug problem by seeking counseling and hospitalization at a treatment center and that she travelled to San Antonio to help her adult daughter who had been in a car wreck. However, these two facts do not outweigh the other evidence presented to the trial court regarding M.D.'s ongoing drug use and instability.

The lack of stability in M.D.'s home also supports termination. *See Holley*, 544 S.W.2d at 371–72 (factor seven). M.D. testified that she had "always been able to provide for [her] children" and "always had our own stable home," and that, at the time of trial, she and R.D. had a home and would be able to provide for H.D. because R.D. was working regularly. M.D. further testified that she was making only $50 to $75 dollars a week. Therefore, she was dependent upon R.D., and she stated that, if her children were returned to her, she planned to be a homemaker while R.D. worked.

However, the evidence also established that, in addition to the domestic violence conviction, R.D. had an extensive criminal background and substance abuse problems. R.D. also testified that his probation in the case arising from domestic violence against M.D. was revoked when he could not pay fines due to unemployment. While R.D. was imprisoned, M.D. was unable to provide a home for herself and her children. At the time DFPS became involved with the family, C.Y. was living with her maternal uncle, in spite of a pending DFPS investigation into allegations that he had sexually abused C.Y., while M.D., J.H., and H.D. were living in unstable circumstances, sharing a home with multiple unrelated adults, whom M.D. knew were using drugs, because she had nowhere else to go. Victorian testified that neither M.D. nor R.D. had cooperated with DFPS or completed their family service plan.

33

The trial court, as the factfinder, was not required to credit M.D.'s testimony that her current home was stable. M.D. presented no evidence that she was able to support herself and a child without R.D.'s contributions, and she presented no evidence that she and R.D. had made significant changes to address the substance abuse problems and criminal activity that led to H.D.'s removal.

M.D. also mistakenly argues that "there was no clear evidence that the foster home would ever become permanent." Victorian testified that DFPS's goal for H.D. was adoption, that H.D. loved her foster parents and they loved her, and that the family had "talked about" adopting H.D. and had begun filling out some of the forms required to adopt H.D. Victorian also testified that H.D.'s foster family was meeting all of H.D.'s needs. *See Holley*, 544 S.W.2d at 371–72 (factors include stability of home or proposed placement and plans for child by individual or agency seeking custody).

Thus, these factors support the trial court's finding that termination was in H.D.'s best interest. *See In re M.R.*, 243 S.W.3d 807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding evidence factually sufficient to support best interest finding because parents exposed children to domestic violence and drug abuse, mother had failed to obtain housing and employment, and children flourished in foster care).

34

Furthermore, Victorian testified that M.D. was uncooperative with DFPS and did not complete the service plan created by DFPS to help reunite her with her children. Specifically, Victorian testified that she did not remain drug free, as evidenced by the results of her drug tests, and she did not complete her drug assessment. M.D. herself admitted that she did not complete her counseling. *See Id.* at 821 (stating that parent's noncompliance with service plan may affect factfinder's determination of child's best interest).

As M.D. points out in her brief, there was no evidence in the record regarding H.D.'s desires, nor was there evidence that H.D. was fearful of M.D. or of several other factors. However, the statutory and *Holley* factors are not an exhaustive list, and the trial court need not have evidence on every element listed in order to make a valid finding on H.D.'s best interest. *See In re C.H.*, 89 S.W.3d at 27.

Thus, considering all of the evidence, we conclude that the evidence was legally sufficient to support the trial court's finding that termination of M.D.'s parental rights was in H.D.'s best interest. *See* TEX. FAM. CODE ANN. § 263.307(b); *In re J.F.C.*, 96 S.W.3d 264–66; *In re R.R.*, 209 S.W.3d at 116. We further conclude that the evidence is factually sufficient because the evidence is such that a reasonable fact finder could form a firm belief or conviction that

termination of M.D.'s parental rights was in H.D.'s best interest. *See In re C.H.*, 89 S.W.3d at 18–19, 27.

We overrule M.D.'s fourth issue.

We conclude that the trial court did not err in terminating M.D.'s parental rights to H.D.

## Termination of R.D.'s Parental Rights

In his first issue, R.D. argues that the evidence supporting the trial court's termination of his parental rights to H.D. under subsection 161.001(1)(D) was legally and factually insufficient.

### A. Termination under Subsection 161.001(1)(D)

Subection 161.001(1)(D) provides that a "court may order termination of the parent-child relationship if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. . . ." TEX. FAM. CODE ANN. § 161.001(1)(D).

Subsection (D) requires a showing that the environment in which the child is placed posed a danger to the child's physical or emotional health, and it permits termination based on a single act or omission by the parent. *Jordan*, 325 S.W.3d at 721; *In re L.C.*, 145 S.W.3d 790, 795–96 (Tex. App.—Texarkana 2004, no pet.).

Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in her home is a part of the "conditions or surroundings" of the child's home under subsection 161.001(1)(D). *Jordan*, 325 S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d at 502. Thus, although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering environment. *See Jordan*, 325 S.W.3d at 721; *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied). For example, abusive or violent conduct by a parent or other resident of the child's home, as well as illegal drug use and criminal activity, supports a conclusion that the child's surroundings endanger her physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d at 125.

Here, we have already concluded that the evidence was legally and factually sufficient to support a conclusion that M.D.'s course of conduct endangered H.D. under subsection 161.001(1)(E). The evidence demonstrated that R.D. left H.D. in M.D.'s care while he was imprisoned, in spite of his knowledge of M.D.'s drug use. The evidence also demonstrated that R.D.'s own actions, in the form of his conviction for family violence against M.D. and other crimes, and his own drug and alcohol use likewise created surroundings that endangered H.D.'s physical and emotional well-being. *See id.* (holding that abusive or violent conduct by parent or other resident of child's home, as well as illegal drug use and criminal activity,

support conclusion that child's surroundings endanger child's physical or emotional well-being).

R.D. argues that he was not aware of the children's living conditions and that, when he went to prison, the family was living with his mother-in-law. He also argues that there was no evidence to establish that H.D. was living in endangering conditions prior to the time he went to prison. However, this is a mischaracterization of the evidence.

R.D. admitted that at the time DFPS took custody of H.D. he was incarcerated pursuant to a conviction for domestic violence that he committed against M.D., H.D.'s mother. R.D. also admitted that the violence had occurred while H.D. was at home, although he stated that the violence occurred outside while the children were inside. R.D. also admitted that he had an extensive criminal history including convictions for marijuana possession, burglary of a habitation, and driving with a suspended license. R.D. further testified that he had a history of drug and alcohol abuse, and DFPS presented evidence in the form of a positive drug test on August 23, 2011 that his drug use continued after he was released from prison. Victorian further testified, and R.D. acknowledged, that R.D. did not complete his family service plan; specifically, he did not complete his substance abuse evaluation and treatment. R.D. testified that he knew M.D. had used drugs and that he had smoked marijuana with her prior to his incarceration.

R.D. argues that *Earvin v. Department of Family & Protective Services*, 229 S.W.3d 345 (Tex. App.—Houston [1st Dist.] 2007, no pet.), controls this case. In *Earvin*, this Court determined that the evidence was insufficient to support the trial court's finding that Earvin violated subsections 161.001(1)(D) and (E) because the uncontradicted evidence demonstrated that he provided for his child while she and her mother were in a drug abuse treatment center, but he lost contact with them when they left the center and could not track them down again until his daughter was already in DFPS care. *Id.* at 348. However, this case is distinguishable. R.D. did not "lose contact" with M.D.—he was imprisoned related to his conviction for domestic violence against her. Unlike *Earvin*, R.D.'s testimony that he was not aware of the circumstances in which his family was living was contradicted by Victorian's testimony that R.D. remained in contact with M.D. The trial court, as the factfinder, was entitled to credit Victorian's testimony and discredit R.D.'s testimony. Finally, R.D. himself testified that his incarceration was a contributing factor both to his family's unstable circumstances and to H.D.'s ultimately being required to live in a home with multiple unrelated adults involved in various illegal activities.

R.D. also appears to argue that the fact of his incarceration, by itself, cannot support a conclusion that he violated subsection 161.001(1)(D). *See In re E.N.C.*, 384 S.W.3d 796, 803–04 (Tex. 2012) (holding evidence was legally insufficient to

support termination under subsection 161.001(1)(E) where evidence indicated that father's conviction, probation violation, and deportation were remote in time and did not suggest father engaged in course of endangering conduct). However, as demonstrated from the evidence recounted above, the evidence of R.D.'s conviction for domestic violence against M.D. was not the only evidence showing that the environment in which H.D. was placed posed a danger to her physical or emotional health. *See Jordan*, 325 S.W.3d at 721.

Furthermore, the supreme court did not hold that courts could not consider evidence of a conviction in determining whether a child was endangered—it stated just the opposite: "[W]e agree that [the father's] conviction, probation violation, and deportation were all factors to be considered" and that "an offense occurring before a person's children are born can be a relevant factor in establishing an endangering course of conduct." *In re E.N.C.*, 384 S.W.3d at 803–05. The reasons that the supreme court articulated in *In re E.N.C.* for concluding that "no reasonable fact finder could have formed a firm belief or conviction that [the father] engaged in a course of endangering conduct"—the lack of specific information concerning the father's conviction and deportation that occurred "long before" his children were born and the lack of any other evidence indicating that the father endangered his children—do not apply here. *Id.* Here, DFPS presented adequate evidence demonstrating that R.D.'s conviction for domestic violence and

40

subsequent probation violation, in addition to his ongoing drug use problems and his knowledge of M.D.'s drug use, created an environment that posed a danger to H.D.'s physical and emotional health. *See* TEX. FAM. CODE ANN. § 161.001(1)(D); *Jordan*, 325 S.W.3d at 721; *In re L.C.*, 145 S.W.3d at 795–96.

We conclude that the evidence was legally and factually sufficient to support the trial court's finding that R.D. violated subsection 161.001(1)(D). Accordingly, we do not need to determine whether the evidence was sufficient to support termination under either section 161.001(1)(F) or 161.001(1)(O). *See In re A.V.*, 113 S.W.3d at 362 (holding that trial court only needs to make one finding of parental misconduct under Family Code section 161.001(1)).

We overrule R.D.'s first, second, and third issues.

## B.    H.D.'s Best Interest

In his fourth issue, R.D. argues that the evidence was insufficient to support the trial court's finding that termination of his parental rights was in H.D.'s best interest.

We discussed the evidence of H.D.'s best interest extensively above, and we conclude that much of the same analysis is applicable here in relation to R.D. Evidence of H.D.'s emotional and physical needs now and in the future, of the emotional and physical danger to her now and in the future, and of R.D.'s acts or omissions indicating that the existing parent-child relationship is not a proper one

41

supports termination. *See Holley*, 544 S.W.2d at 371–72 (factors, two, three, and eight). R.D. acknowledged that his imprisonment on a probation violation related to his conviction for domestic violence against M.D. "had some bearing" on the circumstances that caused H.D. to come into DFPS custody. R.D. also admitted that the domestic violence occurred while he resided with H.D., and he acknowledged drug and alcohol abuse. Although he testified that he no longer used drugs and alcohol, DFPS presented evidence that he tested positive for methamphetamine use in August 2011, a few months before trial. R.D. also admitted that he did not complete his service plan, and Victorian testified that R.D. was uncooperative with DFPS and did not complete his services. Specifically, R.D. failed to complete the required drug and alcohol abuse assessment and counseling. Thus, the evidence also supported a conclusion of future danger to H.D. *See* TEX. FAM. CODE ANN. § 263.307(b) (providing that courts may consider magnitude, frequency, and circumstances of harm to child, whether there is history of substance abuse, and parent's willingness to seek out and complete counseling services and cooperate with appropriate agency); *In re M.R.*, 243 S.W.3d at 821 (holding that parent's noncompliance with service plan may also affect factfinder's consideration of child's best interest).

The evidence of R.D.'s parenting skills and ability to provide a stable home was not significantly different from the evidence of M.D.'s parenting skills.

Although R.D. testified that he provided for and cared for H.D. before he went to prison, he also testified that he assaulted M.D. and that he had a criminal history and issues with past drug use. *See In re R.R.*, 294 S.W.3d 213, 235 (Tex. App.— Fort Worth 2009, no pet.) (holding that exposure to domestic violence is relevant when considering child's best interest); *In re V.V.*, 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc) (holding that parent's extensive criminal record also reflects on best interest of children in maintaining relationship with that parent); *In re J.B.W.*, 99 S.W.3d 218, 229 (Tex. App.—Fort Worth 2003, pet. denied) (holding that incarceration is one factor courts can consider when determining best interest of children).

Thus, we conclude that the evidence was sufficient to support the trial court's finding that termination of R.D.'s parental rights was in H.D.'s best interest.

We overrule R.D.'s fourth issue.

We conclude that the trial court did not err in terminating R.D.'s parental rights to H.D.

### Appointment of DFPS as Sole Managing Conservator

Both M.D. and R.D. argue, in their fifth issues, that the evidence was legally and factually insufficient to support the trial court's appointment of DFPS as H.D.'s sole managing conservator.

There is a rebuttable presumption that it is in a child's best interest for his parents to be named his joint managing conservators. TEX. FAM. CODE ANN. § 153.131(b) (Vernon 2008). In order to rebut this presumption and appoint someone other than a parent as sole managing conservator of the child, a court must find that appointment of a parent would "significantly impair the child's physical health or emotional development." *Id.* § 153.131(a); *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Additionally, "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship[.]" TEX. FAM. CODE ANN. § 153.002 (Vernon 2008). Unlike the standard of proof for termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need only be established by a preponderance of the evidence. *See id.* § 105.005 (Vernon 2008); *In re J.A.J.*, 243 S.W.3d at 616.

Likewise, the standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for termination of parental rights. *In re J.A.J.*, 243 S.W.3d at 616. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion only. *Id.* (citing *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex. 1982)). Therefore, we will reverse the trial court's appointment of a non-parent as sole

44

managing conservator only if we determine that the appoitnment is arbitrary or unreasonable. *Id.*

We have already concluded that the evidence was sufficient to support termination of both M.D.'s and R.D.'s parental rights under the higher, clear-and-convincing burden. Thus, we conclude that the trial court did not abuse its discretion in appointing a non-parent, DFPS, as the sole managing conservator of H.D. *See Quiroz v. Department of Family & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at * 11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.) (refusing to consider issue challenging sufficiency of evidence supporting DFPS's appointment as sole managing conservator when court had already upheld trial court's termination of parental rights).

We overrule M.D.'s and R.D.'s fifth issue.

### Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Sharp, and Huddle.

Sharp, J., concurring.

45